# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7275 | **DATE** | 8/15/2001 |
| **CASE TITLE** | Shome N. Sinha vs. The Board of Trustees of The University of Illinois | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 36-1 is granted. Judgment is entered in favor of Defendant The Board of Trustees of The University of Illinois and against Plaintiff Shome N. Sinha.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | 2 | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | | |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | AUG 1 6 2001 | | 78 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 8/15/2001 | | |
| | | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | | ETV | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

CD-7
FILED FOR DOCKETING
01 AUG 15 PM 5: 41

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SHOME N. SINHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98 C 7275 |
| | ) | |
| THE BOARD OF TRUSTEES OF | ) | Judge Rebecca R. Pallmeyer |
| THE UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**

AUG 1 6 2001

## MEMORANDUM OPINION AND ORDER

Shome Sinha ("Plaintiff"), pro se, brings this action against the Board of Trustees of the University of Illinois ("Defendant"), claiming that Defendant denied him tenure because of his Indian national origin in violation of Title VII of the Civil Rights Act of 1964. Defendant has moved for summary judgment, and, for the reasons stated below, the court grants Defendant's motion.

## FACTUAL BACKGROUND

The following facts are set forth in Defendant's Statement of Uncontested Material Facts in Support of Defendant's Motion for Summary Judgment ("Defendant's Statement") and Plaintiff's Local Rule 56.1(b)(3)(b) Statement of Uncontested Material Facts That Preclude Summary Judgment ("Plaintiff's 56.1 Statement"), to which Plaintiff has appended his own thirty-five page single-spaced affidavit.

### A. Parties

Defendant has campuses in Chicago ("UIC"), Springfield, and Urbana-Champaign. This case involves Defendant's UIC campus, which consists of fifteen

different colleges, including the College of Engineering. The College of Engineering has five departments, one of which is the Civil and Materials Engineering Department (formerly, and at all times relevant to this case, the Civil Engineering, Materials and Metallurgy ("CEMM") Department). (Defendant's Statement ¶ 1.)

Plaintiff, a resident of Illinois, received a doctoral degree in Metallurgical Engineering from the University of Utah in June 1984. (Ex. 22 to Defendant's Statement.) From May 1985 until September 1988, Plaintiff worked on the postdoctoral staff at the Argonne National Laboratory, a science and technology research center. (*Id.* ¶ 3.)

## B. Plaintiff's Work at UIC

In 1986, while still working at Argonne, Plaintiff applied for a position as Adjunct Professor in the CEMM Department. Dr. Chien Wu, Head of the CEMM Department, hired Plaintiff. (*Id.* ¶ 2.) Plaintiff admits that Wu knew that Plaintiff was from India (Sinha Dep., at 335), but claims Wu was "forced" to hire him because two professors in the department were to be away on sabbatical, the department was required to offer certain "specialty courses" as scheduled, and Plaintiff was the only individual who had applied for the job. (Plaintiff's 56.1 Statement ¶ 17; Sinha Aff. ¶ 11.) Defendant notes that Plaintiff has presented no evidence to support his assertion that he was the only individual who applied for the Adjunct Professor position, but does not itself provide the court with evidence of other applicants.

In 1988, two years after Wu hired him as an Adjunct Professor, Plaintiff and twenty-three other candidates applied for a tenure-track position as Assistant

2

Professor.[1]  (Defendant's Statement ¶ 10.)  Defendant interviewed only two of the twenty-four candidates–Plaintiff and Dr. In-Gann Chen.  (*Id.*)  On September 7, 1988, Wu recommended Plaintiff to Dr. Paul Chung, Dean of the College of Engineering.  (Ex. 7 to Defendant's Statement.)  That same day, Chung approved Wu's recommendation.  (Ex. 8 to Defendant's Statement.)  Wu sent Plaintiff a formal offer letter on September 27, 1988.  (Ex. 10 to Defendant's Statement.)

Plaintiff again claims that Wu, and thus Defendant, were "forced" to hire him, this time because the CEMM Department had only three full-time faculty members scheduled to teach courses in the Fall 1988 quarter, and the Accreditation Board for Engineering and Technology (ABET), which monitors the accreditation of engineering programs throughout the country, required at least four.  (Plaintiff's 56.1 Statement ¶ 18(d); Sinha Aff. ¶ 13.)  The evidence Plaintiff presents to demonstrate that Wu's hand was forced, however, fails to prove his point.  Plaintiff offers memoranda from three CEMM Department professors to Wu dated March 24, 1989 and June 14, 1989 regarding the ABET requirements and the need to recruit a ceramist (Ex. 25 to Plaintiff's Statement); Plaintiff, however, had already been hired as an Assistant Professor on September 27, 1988.  In any event, accrediting pressures may have "forced" UIC to select one of the twenty-four candidates for the slot, but those pressures

---

[1]  During the first year of his employment as an Assistant Professor, Plaintiff changed his area of concentration from the "dying" field of extractive metallurgy to the "emerging" field of the processing of superconductors and ceramic matrix composites.  (Sinha Dep., at 259-63.)  Neither party explains why, in 1988, Defendant sought and chose to hire a professor specializing in a "dying" science.

would not have dictated the selection of Plaintiff from the field of candidates.

## C.    Plaintiff's Probationary Period

Once hired as an Assistant Professor, Plaintiff embarked upon a six-year probationary period. During this period, UIC had the right to terminate Plaintiff at any time but did not do so.[2] After his first year, Defendant increased Plaintiff's salary from $38,000 to $42,600. (Ex. 11 to Defendant's Statement.) Wu notified Plaintiff of this increase in a July 28, 1989 memorandum, in which Wu stated: "This was your first year on the tenure track, and you have accomplished as much as one can expect in one year; [but] I would like to take this opportunity to remind you that single authored and refereed journal publications consist of one of the most important elements in all performance/tenure/promotion evaluations." (*Id.*) Plaintiff claims that, as of July 1989, he had published seven articles in peer-reviewed (otherwise known as "refereed") journals before joining UIC, and published two "other articles" (e.g., bulletins, technical reports, articles in symposium or conference proceedings), secured a patent, and received an $8,000 grant since joining UIC. (Sinha Aff. ¶ 60, Table 1.)

On May 31, 1990, during the second year of his probationary period, Plaintiff

---

[2]    Plaintiff claims that, throughout this six-year probationary period, Wu discriminated against him, misrepresented his qualifications, and sought to have him terminated. Plaintiff, however, offers no evidence of personal animus other than derogatory comments that Wu allegedly made to Plaintiff about his Indian national origin on September 26, 1991. According to Plaintiff, Wu had asked Plaintiff to pay H.W. Park, one of Plaintiff's teaching assistants, with money from Plaintiff's research grant. When Plaintiff told Wu that this would be a violation of his grant, Wu responded: "You Indians have trouble following me or helping me. . . . You Indians have hot blood or so I don't know. You are all the same. I don't know how to handle it." (*Id.* ¶ 38.)

submitted an invention disclosure to the Office of Vice-Chancellor of Research. According to University Statutes, "[t]he results of research or development carried on at the University by any of its faculty . . . and having the expenses thereof paid from University funds . . . belong to the University and are to be used and controlled in ways to produce the greatest benefit to the University and to the public." (Exhibit 1 to Plaintiff's 56.1 Statement, at Art. XII, § 2.) "An inventor," the Statutes continue, "whose discovery or invention is subject to the conditions of the previous paragraph is required to disclose the discovery or invention to the University and may be required to patent the discovery or invention and to assign the patent to the University . . . ." (*Id.*) The Statutes do not provide a time frame for Defendant to respond to an invention disclosure.

Defendant did not decide whether it would pursue a patent application for Plaintiff's invention or assign the rights to the invention to Plaintiff until September 30, 1991; at that time, it chose to assign the rights to Plaintiff. (Ex. 39 to Plaintiff's 56.1 Statement.) Plaintiff contends that the sixteen-month delay prevented him from publishing five manuscripts having to do with the invention, each of which he later published in refereed journals. (Plaintiff's 56.1 Statement ¶ 30.) Defendant considers any such delay irrelevant to Plaintiff's claim because Plaintiff (1) had published all of these manuscripts (and such manuscripts were considered by Defendant) by the time he was formally denied tenure and, more importantly, (2) chose to pursue a patent, thereby risking a delay in publication, rather than publishing his results. (Defendant's Response to Plaintiff's 56.1 Statement ¶ 29.)

5

On July 30, 1990, Wu wrote a memorandum to Plaintiff informing him that Defendant had again increased his salary, from $42,600 to $45,000. (Ex. 13 to Defendant's Statement.) The memorandum included the following language:

> [Y]ou are congratulated for the awarding of a total of $65,000 in research funds from ENR-Illinois [Illinois Department of Energy and National Resources]. However, I would like to emphasize and remind you, again, about the importance of single authored and refereed journal publications, as you have not indicated any change in your record. In this connection, I would like to point out to you that conference presentations, however important they are in your pursuit of recognition, are not counted in any performance/tenure/promotion evaluation.

(*Id.*) Plaintiff claims that, as of July 30, 1990, he had (a) seven refereed publications before joining UIC, (b) three "other articles" and one patent since joining UIC, and (c) received $43,000 in grants since joining UIC.[3] (Sinha Aff. ¶ 60, Table 1.)

On February 25, 1991, Wu reminded Plaintiff and another Assistant Professor, Dr. Mohsen Issa, that a Mid-Probation Review ("MPR") was upcoming. (Ex. 27 to Plaintiff's 56.1 Statement.) The CEMM Department conducted a MPR of Plaintiff on May 17, 1991. (Defendant's Statement ¶¶ 17, 23.) Plaintiff claims that, as of the day of his MPR, he had published seven articles in refereed journals before joining UIC, and published three "other articles," secured one patent and received $83,000 in grants since joining UIC. (Sinha Aff. ¶ 60, Table 1.) Moreover, Plaintiff claims Wu was well aware that Defendant was "still forcing Plaintiff not to submit five manuscripts for

---

[3]     Plaintiff may have mischaracterized, to his detriment, the amount of grant money he had received by this time. Wu's July 30, 1990 memorandum to Plaintiff reflects Wu's understanding that Plaintiff had received at least $65,000 in grant money as of July 30, 1990.

peer review," (presumably, by failing to act on his invention disclosure). (Plaintiff's 56.1 Statement ¶ 18.) On June 3, 1991, Wu sent Plaintiff a memorandum wherein he stated that, at the MPR: "All members of the Committee [comprised of Full and Associate Professors from the CEMM Department] expressed grave concern about your apparent inactivity in the area of refereed journal publication. . . . I must warn you again that unless I see an overwhelming progress by February 1992 I will recommend the issuance of a terminal contract for the academic year 1992-93." (Ex. 14 to Defendant's Statement.)

On March 9, 1992, the CEMM Department conducted a follow-up MPR of Plaintiff. (Defendant's Statement ¶ 20.) Plaintiff asserts that, at the time, he had (a) seven refereed publications before joining UIC, (b) two accepted refereed journal publications, (c) three "other articles," (d) one patent, and (e) $154,000 in grants since joining UIC. (Sinha Aff. ¶ 60, Table 1.) On March 23, 1992, Wu sent Plaintiff a memorandum wherein he stated that: "The weakness of your journal publication record continues to be the major concern of the Committee. The Committee shall reconvene in January 1993 to decide whether or not you should be recommended for continuation on the tenure track." (Ex. 17 to Defendant's Statement.)

On November 13, 1992, in response to a request from Wu, Plaintiff provided Wu with an updated list of his publications. According to the list, Plaintiff had published three articles in refereed journals since he became an Associate Professor in 1988. (Ex. 19 to Defendant's Statement.)

7

## D.    The Promotion and Tenure Process

By the fall of 1993, Plaintiff had advanced to the point where he was to be reviewed for promotion with tenure. University Statutes provide that "promotions of the academic staff . . . shall be made by the Board of Trustees, on the recommendation of the chancellor . . .," and that "whenever the appointment or promotion of members of the academic staff is involved, the dean, before making a recommendation, shall consult the chair or head of the department after confirming that intradepartmental consultation procedures have been satisfied." (Ex. 1 to Defendant's Statement, at Art. IX, § 3a & d.). Moreover, these Statutes state that, when considering the promotion of academic staff members, "special consideration shall be given to the following: (1) teaching ability and performance; (2) research ability and achievement; and (3) ability and performance in continuing education, public service, committee work, and special assignments designed to promote the quality and effectiveness of academic programs and services." (*Id.*, at Art. IX, § 3e.)

The University Statutes, however, do not specify the procedures to be conducted. At the time relevant to Plaintiff's consideration, a set of procedures were instead set forth in a July 13, 1993 memorandum from Dr. John Wanat, Executive Associate Vice Chancellor for Academic Affairs, to the Academic Deans.[4] (Ex. 2 ("Promotion and

---

[4]    Plaintiff makes much of an April 2, 1993 letter to the UIC faculty from the UIC Faculty Advisory Committee ("FAC"). (Ex. 8 to Plaintiff's 56.1 Statement.) The letter emphasized what the FAC considered to be "a loss of faculty rights in the peer group process regarding promotion and tenure" and set forth recommendations for restoring such rights. The recommendations of the FAC, however, are not binding on (continued...)

8

Tenure Procedures, Policies, and Forms, 1993-94") to Defendant's Statement.)  The following paragraphs will outline the process discussed in Wanat's memorandum and describe how each step of the process was conducted with respect to Plaintiff.

1.      First, a member of the candidate's department who is senior in rank to the candidate prepares a Promotion and Tenure ("P&T") Application.  The candidate is responsible for furnishing the information required for the preparer to compile the P&T Application.  The P&T Application includes, among other things, (a) a description of the candidate's education and employment background; (b) lists of the candidate's publications both prior to and after joining the University;[5] (c) lists of research grants received by the candidate; (d) letters of recommendation from professors outside the University in the candidate's field; and (e) the candidate's statement of current and planned research.  (Defendant's Statement ¶ 28(a) & (b).)

In July 1993, Wu asked Dr. Michael McNallan, a senior professor in the CEMM Department and a friend of Plaintiff's (McNallan Aff. ¶ 2), to prepare Plaintiff's P&T Application.   (Defendant's Statement ¶ 29.)   According to the P&T Application prepared by McNallan, Plaintiff had published seven articles in refereed journals

_____

[4](...continued)
Defendant and the court concludes that the April 2, 1993 letter has no relevance to Plaintiff's case.

[5]      Defendant asserts that, although the P&T Application includes the candidate's publications both prior to and after joining the University, it generally accords the latter far more weight.  (*Id.* ¶ 28(c).)  Plaintiff denies this, but his only evidentiary support is the absence of any expression of such a policy in the University Statutes.  (Plaintiff's Response ¶ 28(c).)

before joining UIC, and, since joining UIC, had (a) published another seven publications in refereed journals (three in 1992 and four in 1993); (b) had one article accepted to be published in a refereed journal; and (c) received approximately $250,000 in research grants. (*Id.* ¶ 30; McNallan Aff. ¶ 4.)

In addition to this list of publications, Plaintiff's P&T Application included positive recommendations from four external reviewers: Dr. S.X. Dou; Dr. Victor Maroni; Dr. R.G. Reddy; and Dr. Eric Hellstrom. For example, Dr. Dou, a professor specializing in the area of high temperature superconductors at the University of New South Wales, wrote: "[Dr. Sinha's] standing in research is evidenced by the fact that 20 papers[6] have been published in the international journals and three patents have been filed or obtained. . . . I have every confidence for his academic ability to fulfil [sic] the requirements of the associate professor position." (Ex. 22 to Defendant's Statement.) Dr. Maroni, the director of high temperature superconducting material research in the Chemical Technology Laboratory at Argonne (Plaintiff's former employer) wrote: "In my experiences with Dr. Sinha I have found him to be a serious-minded, dedicated scientist with a good grasp of the fields of endeavor he has chosen to work in. The quality of his work is well above the norm for basic research at the university/national laboratory level . . . ." (*Id.*) Dr. Reddy, a professor of Metallurgical Engineering at the University of Nevada, Reno, wrote: "I have known Dr. Sinha for more than eight years as an exceptionally competent colleague and productive

---

[6]     The record provides no explanation for the "20 paper" figure included in Dr. Dou's review.

researcher." (*Id.*) And Dr. Hellstrom, an Associate Professor at the University of Wisconsin working primarily in the area of high temperature superconducting ceramics wrote: "It is a pleasure to recommend Shome Sinha for promotion to Associate Professor with tenure. I am familiar with his work with high-temperature superconductors. These are extremely complicated systems in which it is interdisciplinary groups of investigators that are making headway on the critical problems. Sinha participates in such interdisciplinary groups . . . ." (*Id.*)

2.      After the P&T Application is prepared, a committee from the candidate's department meets to review the candidate. Prior to the meeting, each member of the committee receives the P&T Application. (Defendant's Statement ¶ 28(e).) Following a discussion of the candidate's case, the committee members, but not the Department Head, vote on whether the candidate should be promoted with tenure. (*Id.* ¶ 28(f).)

On November 8, 1993, the CEMM Department Review Committee met to consider Plaintiff's P&T Application. (*Id.* ¶ 31.) The Committee members voted 8-0 in favor of Plaintiff's promotion with tenure. (*Id.*) No minutes were recorded at this meeting or any later committee meeting involving Plaintiff's P&T application (e.g, the College of Engineering Executive Committee meeting, and the Graduate College Executive Committee meeting).

3.      After the Department Committee meets and votes, the Department Head prepares his or her independent evaluation with respect to the P&T Application (a "Justification for Recommendation"), which includes an appraisal of the candidate's teaching ability (excellent, good, average, or below average) and service record

11

(excellent, satisfactory, or below average). (*Id.* ¶ 28(g) & (h).) The Department Head then sends the P&T Application, along with his or her Justification, to the relevant College Executive Committee, composed of professors from various departments in the candidate's college. (*Id.* ¶ 28(j).)

On November 10, 1993, two days after the Department Review Committee met and voted unanimously in favor of Plaintiff's application, Wu prepared his Justification for Recommendation of Plaintiff. This Justification stated:

> In this five-year period [of Plaintiff's employment at UIC], he has impressed the students as an enthusiastic teacher, served the department well by supporting a large number of graduate students, even at the expense of his own summer compensation and, above all has managed to successfully redirect his research thrust from the dying subject of extractive metallurgy to the promising and yet uncertain area of materials processing by design of microstructures. . . . The recommendation has my wholehearted endorsement.

(*Id.* ¶ 32.) Wu separately rated Plaintiff's teaching ability as "good," recognizing that Plaintiff's teaching load was "on the low side," but noting that students were "generally impressed by his enthusiasm toward teaching." Wu rated Plaintiff's service record as "satisfactory;" he observed that Plaintiff's "ability in supporting a large number of graduate students . . . is a very significant service to the department and that Plaintiff's involvement in non-University professional activities has been very extensive and impressive." (*Id.* ¶ 33.)

Wu forwarded Plaintiff's P&T Application, along with his Justification, to the College of Engineering Executive Committee. (*Id.* ¶ 34.) According to Wu, he had no conversation with any member of the College Executive Committee regarding

Plaintiff's Application. (Wu Aff. ¶ 21.)

4.    The respective College Executive Committee then meets, reviews and votes on the candidate's application. After this vote, the Dean of the College prepares a written Justification with respect to the P&T Application. The Dean of the College is expected to provide independent judgment and is not required to agree with the College Executive Committee vote. The P&T Application is then sent to the Graduate College Executive Committee, which is composed of professors from various colleges at UIC and serves to ensure that standards of academic excellence are maintained across the University.

On January 10, 1994, the College of Engineering's Executive Committee met to review Plaintiff's P&T Application. Dr. Alexander Chudnovsky was the CEMM Department representative to the College of Engineering's Executive Committee and presented the CEMM Department's recommendation to the members. The College of Engineering's Executive Committee voted 3-2, with no abstentions, in favor of Plaintiff's promotion with tenure. As noted earlier, no minutes were taken at this meeting.

One week later, on January 17, 1994, Plaintiff sent Wu a memorandum stating that two more of Plaintiff's articles had recently been accepted for publication in refereed journals. (Defendant's Statement ¶ 41.) According to Wu's affidavit, once he received Plaintiff's memorandum, he updated both his Justification and the list of research activity on Plaintiff's P&T Application to account for these newly-accepted articles. (Wu Aff. ¶¶ 23, 24.) With the addition of these articles, Plaintiff had

published seven articles in refereed journals before joining UIC, had published another seven articles in refereed journals since joining UIC, and had three additional articles accepted for publication in refereed journals. Wu claims to have then forwarded this *updated* Justification to Chung at the College of Engineering. (Wu Aff. ¶ 24.) Defendant asserts that this is the version of Wu's Justification that it has included as part of Exhibit 22 to Defendant's Statement.[7]

On January 21, 1994, Dr. Paul Chung, Dean of the College of Engineering, wrote a Justification for Recommendation in favor of Plaintiff's promotion. In this Justification, Chung stated the following:

> I concur with the Executive Committee and recommend the promotion of

---

[7] Wu claims that when he updated his Justification, he did not create a new word processing file. Furthermore, according to Wu, the "original" Justification cannot be located. (Wu Aff. ¶ 24.) Plaintiff finds this explanation suspect. He insists that Wu prepared an "original" Justification on or around November 10, 1993, and, despite Plaintiff's memorandum, never updated this "original" Justification. Furthermore, Plaintiff claims that the "original" version, which he believes was relied upon by the College of Engineering Executive Committee and Dean Chung (1) reflected only 40% of Plaintiff's refereed journal publications and only 40% of Plaintiff's grant money, (2) contained an incorrect quality assessment of the grants Plaintiff received, and (3) failed to mention the excellent ratings given to Plaintiff by external reviewers. Apart from Plaintiff's speculation, however, no evidence supports his suspicion that the version of Wu's Justification reviewed by the College of Engineering Executive Committee or Chung was substantially different from the one included at Exhibit 22 to Defendant's Statement. To the contrary, Chung averred that (1) he received Wu's "original" Justification at some time before January 10, 1994; (2) he then received Wu's updated Justification at some time before January 21, 1994; (3) the updated Justification did not differ substantially from the "original" Justification, except for the number of publications listed; and (4) the updated Justification is the version included at Exhibit 22 to Defendant's Statement. (Chung Aff. ¶¶ 5, 8.) While Chung is unfortunately not precise about the difference in the number of publications, his affidavit supports Defendant's contention that Wu properly updated and forwarded Plaintiff's records.

14

Dr. Shome Sinha to Associate Professor with tenure. . . .

Dr. Sinha's publications and grant productivity do not yet indicate whether he will succeed in establishing himself as a recognized researcher in his chosen field. On the other hand, he has published 10 papers in refereed journals,[8] more than half of them with graduate students, indicating a significant degree of accomplishment in research. I believe this ambivalence is reflected in the Executive Committee's three positive and two negative votes for his promotion.

(Ex. 22 to Defendant's Statement.) Chung also alluded to the fact that Defendant had diverted resources away from Plaintiff's area of expertise:

During the last two years the CEMM Department has undergone a reorganization involving its metallurgy-material science program. The department has decided to discontinue its undergraduate curricula in metallurgy and material science which have languished for many years with declining and unacceptably small student enrollment. The department, instead, decided to concentrate its resources on the graduate program in materials engineering by collaborating with the mechanics faculty in the department and the materials science faculty in the other three departments of the College. I believe Dr. Sinha had to develop his research and teaching programs in a less than encouraging environment. I believe he will establish a respectable research laboratory in his chosen field.

(*Id.*) Dean Chung then forwarded Plaintiff's P&T Application, along with his Justification, to the Graduate College. He had no conversations with any member of the Graduate College Executive Committee regarding Plaintiff's Application. (Defendant's Statement ¶ 46.)

5.      All members of the Graduate College Executive Committee receive a copy

---

[8]      Chung has stated that, when assessing Plaintiff's publication history, he referred only to those articles that Plaintiff published (and those accepted to be published) in refereed journals after joining UIC. Chung's rationale for this decision was that "a candidate's publications during his probationary period are much more significant than those prior to the probationary period." (Chung Aff. ¶ 8.)

of the candidate's P&T Application. Each candidate is assigned two "readers" on the Committee who review the candidate's P&T Application and summarize it for the other committee members. The committee then votes. After this vote, the Dean of the Graduate College prepares his or her independent recommendation.

On March 15, 1994, the Graduate College Executive Committee met to review Plaintiff's P&T Application, and voted unanimously (9-0) *against* recommending Plaintiff for promotion with tenure. Again, according to the record, no minutes were taken at this meeting. That same day, Jan Rocek, Dean of the Graduate College, wrote his Justification for Recommendation, in which he recommended *against* promoting Plaintiff. In this Justification, Rocek stated that:

> Plaintiff's scholarship is reasonable, but not outstanding, having published approximately seven journal articles with three more expected for publication.[9] His letters of reference are supportive but not strong. Dr. Sinha's funding record is much less than expected. Particularly lacking are peer reviewed grants from national funding agencies where Dr. Sinha is listed as PI [Principal Investigator]. Dean Chung's letter summarizes the ambivalence at the college level as to whether Dr. Sinha has established himself as an independent investigator.

(Ex. 28 to Defendant's Statement.)

6.      The Vice-Chancellor for Academic Affairs ("VCAA") then reviews the P&T Application and makes a recommendation which he or she forwards to the Chancellor

---

[9]      Like Chung, Wanat testified in his affidavit that his reference to seven journal articles published and three accepted referred to Plaintiff's publications in refereed journals since joining UIC. "Those publications," Rocek stated, "are the most important because although the P&T application includes the candidate's publications both prior to and after joining the University, substantially more emphasis is placed on the latter list because it reflects the candidate's work during his/her 'probationary period' and the candidate's more recent achievements." (Rocek Aff. ¶ 9.)

of UIC for final review.

Dean Rocek sent Plaintiff's P&T Application, with his Justification, to VCAA Dr. David Broski, who relied upon his Executive Associate, John Wanat, to conduct a review of Plaintiff's record. (Broski Aff. ¶ 6.) Wanat recommended to Broski that Plaintiff not be granted tenure. (Wanat Aff. ¶ 13.) Broski agreed and, on April 15, 1994, issued a recommendation stating:

> Dr. Sinha is at the margin. He teaches few students and garners acceptable though not strong teaching reviews. He is a reasonably productive though not prolific publisher. Most of his grants are from Argonne National Laboratory, where he was employed and still retains an affiliation. But I am particularly concerned that faculty in the College of Engineering only narrowly supported his bid. Though finally positive, the Dean of Engineering indicates that the publication and grant productivity 'do not yet indicate whether he will succeed in establishing himself as a recognized researcher in his chosen field.' No faculty in the Graduate College Executive Committee supported the case. While it would not be a horrible mistake to tenure Dr. Sinha, the question is whether we could do better to advance the reputation of the College and campus. I think we can and so do not endorse the tenuring and promotion.

(Ex. 29 to Defendant's Statement.)

On April 20, 1994, Dean Chung sent Plaintiff a memorandum, advising him of the adverse decision and his ability to appeal this decision to Chancellor James Stukel. (Ex. 30 to Defendant's Statement.) On April 27, 1994, Plaintiff responded to Chung with an update of his record at UIC. He claimed in this memorandum that, "[s]ince August 1991, I have had fourteen publications accepted and published in reviewed journals, and three manuscripts are under review. Since joining UIC in 1988, I have seventeen publications, fourteen of these are authored jointly with graduate students.

Also, I have three additional publications under review (authored jointly with my students)." (Ex. 31 to Defendant's Statement.) The court cannot find anywhere in the record support for these numbers which conflict, not only with Exhibit 22 to Defendant's Statement, but also with Table 1 in Plaintiff's affidavit. Table 1 notes that, as of April 15, 1994, Plaintiff had published seven articles in refereed journals since joining UIC and had four articles accepted for publication, for a total of eleven (as opposed to seventeen) "publications accepted and published in reviewed journals" since joining UIC.

Plaintiff then asked Dr. McNallan to prepare a written appeal to Chancellor Stukel. McNallan testified that, since early November 1993 (when he prepared Plaintiff's P&T Application), Plaintiff had five additional articles accepted for publication in refereed journals (two of which were referred to in Plaintiff's January 17, 1994 memorandum to Wu), one of which had been published. Thus, according to McNallan, at the time of his appeal, Plaintiff had (a) published eight articles in refereed journals since joining UIC and (b) had four additional articles accepted for, and awaiting, publication. (*Id.*) McNallan wrote in his appeal the following:

> Prof. Sinha's appeal of the recommendation is based on new information, primarily publications and other scholarly activity, since his promotion documents were prepared in early November, 1993. . . . It is Prof. Sinha's concern that these activities were not considered by the College of Engineering and Graduate College Executive committees, although he provided updates on his activities to Prof. Wu in January, February, and April 1994. Prof. Sinha's publication record at UIC reflects a delay which resulted from the change of his principle [sic] research activity from traditional metallurgy into processing of superconducting ceramics and ceramic matrix composites, areas where federal funding is more available. His publications were further delayed by his pursuit of a

patent on an aspect of his early research.

(Ex. 34 to Defendant's Statement.)  Stukel reviewed the appeal, but stood by Broski's recommendation.  (Ex. 35 to Defendant's Statement.)  He notified Plaintiff of this decision on May 23, 1994.  (Stukel Aff. ¶ 10.)  The record does not contain any contemporaneous explanation, written or otherwise, for Stukel's decision.  Stukel later testified that he made his final decision, in part because:

> Dr. Sinha had not demonstrated the ability to obtain large competitive awards from nationally recognized funding agencies; most of Dr. Sinha's grants were small grants from Argonne National Laboratories, his prior employer.  I also determined that granting tenure to Dr. Sinha would not serve the University's best interests because Dr. Sinha's area had been discontinued at the undergraduate level.  Thus, it did not make sense to tenure a professor with a marginal publication and funding record in an area from which the University was diverting resources.  And, Dr. Sinha's teaching, service, and external reviews were not exceptional enough to overcome these weaknesses.

(Stukel Aff. ¶ 9.)

It appears from the record that Defendant did not terminate Plaintiff at this point.  Instead, on November 3, 1994, Defendant offered Plaintiff a two-year appointment, allowing him to continue working as an Assistant Professor at a salary of $47,570 per year.  (Exhibit 45 to Plaintiff's 56.1 Statement.)  The letter noted that "[n]otice of nonreappointment after completion of this contract is hereby given."  (*Id.*)  The court assumes that Plaintiff did not accept this offer and is unaware of the capacity in which Plaintiff has been employed, if at all, since that point in time.

On December 27, 1994, Plaintiff filed a charge with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC),

alleging national origin discrimination. On January 30, 1998, the IDHR dismissed the charge. On August 17, 1998, the EEOC adopted the findings of the IDHR and issued Plaintiff a right to sue letter. On November 13, 1998, Plaintiff, represented by counsel at the time, filed his complaint in this court. On September 22, 1999, the court granted Plaintiff's counsel's motion to withdraw, and Plaintiff entered his pro se appearance that same day. On September 28, 2000, Defendant filed its motion for summary judgment.

### E. Other Promotion and Tenure Decisions at UIC

Disappointingly, neither party describes the ethnic composition of the CEMM Department, the College of Engineering, or any other unit of Defendant at any time relevant to Plaintiff's claim. To support his claim of national origin discrimination, however, Plaintiff has offered a labyrinthine affidavit and Statement of Facts in which he compares the adverse decision on his promotion application to the decisions with respect to Professors Jon Solworth (labeled by Plaintiff as simply "non-Indian"—a point not disputed by Defendant), Steve Harren (also labeled by Plaintiff as "non-Indian"—another point not disputed by Defendant), and Mohsen Issa (Lebanese), each of whom was granted promotion with tenure.

#### 1. Dr. Jon Solworth

On April 30, 1993, Defendant offered tenure to Dr. Jon Solworth. Solworth had worked as an Assistant Professor at UIC in the College of Engineering's Electrical Engineering & Computer Science Department since 1987. At the time Solworth was reviewed for promotion, he had (a) no publications prior to joining to UIC, (b) three

20

refereed journal publications, four "other articles," and no patents since joining UIC, and (c) received approximately $400,000 in grants. (Sinha Aff. ¶ 59, Table 0.) In his January 20, 1993 Justification for Recommendation of Solworth, Dean Chung wrote:

> Dr. Solworth is an experimentalist who works with computer architecture upon which the design of new computers are based. Any experimental engineering is expensive and time-consuming. This explains the relatively small number of publications for Dr. Solworth. . . . I recommend that Dr. Solworth be promoted to associate professor with tenure.

(Ex. 6 to Plaintiff's 56.1 Statement.) Plaintiff claims that he too is an experimentalist and does not understand why the same logic employed by Chung with respect to Solworth would not apply to him. Defendant responds that Solworth was in a different department from Plaintiff, was considered for tenure in a different year, and had received significantly more grant money. (Defendant's Response to Plaintiff's 56.1 Statement ¶ 21.)

## 2. Dr. Steve Harren

In 1996, Defendant offered tenure to Dr. Steve Harren. Harren had worked as an Assistant Professor in the CEMM Department since 1990. Like Plaintiff, Harren was hired by Wu. On November 21, 1995, Wu, in his Justification for Recommendation for Harren, wrote that:

> Harren was hired for his impeccable educational background (UIC and Brown), his research concentration in crystal plasticity and, above all, his absolutely first rate publications at that time. He had only long and definitive contributions in top journals then and his recent single authored publications retain the same first rate quality. Uncompromising quality scholarship is what this recommendation is all about. . . . His total number of publications stands at 12, 5 before joining UIC, 5 since and 2 in press. He has received approximately a total of

$150K in research grants . . . . Many of us, including myself, have been indoctrinated by many years of P&T processes into a mentality of number counting. Harren's record does not carry a single large number. In all the P&T dossiers I have prepared over the years this is the first and only one in which I strongly feel that quality should overshadow all other considerations.

(Ex. 6 to Plaintiff's Statement.) Plaintiff considers his record, especially his number of publications and amount of grant money, to be more impressive than Harren's. Moreover, Plaintiff claims that he and Harren worked in the same "area," a fact which, Plaintiff argues, undermines one of Chancellor Stukel's alleged reasons for denying Plaintiff tenure—the discontinuation of Plaintiff's "area" of research at the undergraduate level. (Plaintiff's Statement ¶ 93.) Defendant responds that Plaintiff's assertions are unsupported by any evidence and, further, that the P&T files make clear that Plaintiff and Harren specialized in different "areas"—Plaintiff focused on superconductors and ceramics while Harren focused on crystal plasticity and the interaction between material science and the mechanics of solids. (Defendant's Response ¶ 94.) Defendant also notes that, unlike Plaintiff, Harren was described by external reviewers with such unparalleled superlatives as "a colossus of the future" and "unique among young scientists." (*Id.*)

3.    **Dr. Mohsen Issa**

Dr. Mohsen Issa, who worked as an Assistant Professor at UIC in the CEMM Department and who, as already noted, is of Lebanese origin, was formally offered tenure by Chancellor Stukel on May 17, 1994. Issa was hired in January 1989 and focused his research on concrete. (Defendant's Statement ¶ 61.) In 1991, the CEMM

22

Department conducted an MPR of Dr. Issa's performance. In a memorandum to Issa after this review, Wu wrote "[a]ll members of the Committee expressed relief in seeing signs of steady progress in all areas, including publication." (Ex. 35 to Defendant's Statement.) Plaintiff claims that, at the time of this MPR, Defendant considered three of Issa's published articles as having been published after beginning work for UIC, even though these publications stemmed from his Ph.D. research as opposed to work performed at UIC. (Plaintiff's 56.1 Statement ¶ 22; Sinha Aff. ¶ 60, Table 4.) As demonstrated by the record, however, the three publications at issue were published in 1989, after Issa began working for UIC. (Exhibit 37 to Defendant's Statement.)

Issa was reviewed for promotion and tenure during the same academic year as Plaintiff. (Defendant's Statement ¶ 63.) Wu prepared Issa's P&T Application, and the Department Review Committee met to consider Issa's case on November 8, 1993. (*Id.* ¶¶ 64-65.) According to Issa's P&T Application in the record, Issa had (a) eight articles published in refereed journals since joining UIC; (b) eight additional articles accepted for publication; and (c) received approximately $300,000 in grant money ($138,720 from the Florida Department of Transportation and $164,314 from the Illinois Department of Transportation).

Plaintiff contests these numbers. Again, he argues that three of the articles considered by Defendant to have been published since Issa joined UIC were actually attributable to work performed prior to joining UIC. Moreover, Plaintiff contends that Wu misrepresented Issa's qualifications in the P&T Application by stating that Issa had received approximately $625,000 in grant money—a $187,520 grant from the

Florida Department of Transportation (FDOT); another $300,786 grant from the FDOT; and a $164,314 grant from the Illinois Department of Transportation. (Plaintiff's 56.1 Statement¶ 40.). A careful reading of Issa's P&T Application demonstrates that Plaintiff is mistaken. The list of sponsored research activity in that Application contains a column labeled "Amount Funded." With respect to certain grants, this column lists two numbers separated by a slash (e.g., $70,539/187,520). A footnote explains: "In multi-investigator projects, lists both total amount and amount attributable to nominee . . . ." The numbers to which Plaintiff refers are the total amount, not the amount attributable to Issa.

Finally, Plaintiff claims that, contrary to the P&T Application, Issa never received a grant from the Florida Department of Transportation. He supports this assertion with an April 14, 1998 e-mail from Sandra Bell, a researcher at the FDOT, stating that Issa never received a grant from the agency. (Ex. 31 to Plaintiff's 56.1 Statement.) Defendant argues, and the court agrees, that the e-mail from Bell is inadmissible hearsay evidence. (Defendant's Response to Plaintiff's 56.1 Statement ¶ 40.) Even if it were admissible, Bell's 1998 statement would not establish that Defendant did not genuinely believe in 1993 that Issa had received a grant from FDOT. Plaintiff also claims that Wu and Dean Rocek stalled an investigation into allegations against Issa of academic misconduct, and did not include a reference to any such allegations in their review of Issa.[10] (Memorandum in Support of Plaintiff's Motion to

---

[10]    The record shows that allegations of academic misconduct were made on
(continued...)

Preclude Summary Judgment ¶ 31.)

On November 10, 1993, Wu wrote his Justification for Recommendation in support of Issa's Application, wherein he stated:

> In addition to being able to publish in the traditional area of structural engineering, he also engages in concrete research at a more fundamental level . . . . This rare capability of combining applied research with basic investigation, together with his persistence and hard work, has netted a total of $300,000 in research funds to his credit to date.

(*Id.* ¶ 67.) Wu rated Issa's teaching as "Good" and service contribution as "Excellent." After Issa's P&T Application was prepared, two of Issa's articles were published in refereed journals. Wu updated the Issa's P&T package to reflect the change.

On January 10, 1994, the College of Engineering Executive Committee met to discuss Issa's P&T Application. As with Plaintiff, Chudnovsky served as the CEMM Department's representative. The College Executive Committee voted 3-1, with one abstention, in favor of promoting Issa. On January 21, 1994, Chung wrote his Justification for Recommendation in support of Issa's application, wherein he stated:

> Since his arrival at UIC, Dr. Issa has worked to modernize the concrete laboratory of the CEMM Department. He has infused new concepts of prefabricated and reinforced concrete technology into the instructional as

---

[10](...continued)
December 13, 1993. (Exhibit A to Plaintiff's 56.1 Statement.) It appears that an investigation of this alleged misconduct was undertaken in or around May 1994. (Exhibit 16 to Plaintiff's Statement.) On September 30, 1994, Rocek sent Issa a letter wherein he stated: "I have reviewed the report submitted by the Inquiry Team regarding allegations of scientific misconduct on your part. Based on this report and in consultation with Dr. Kathleen Knafl, the Research Standards Officer, I have determined that there are insufficient grounds to conduct a formal investigation into this matter. I therefore consider the case closed." (Exhibit 16 to Plaintiff's 56.1 Statement.)

well as research laboratories of the department. His research work in the field is well recognized. Concrete is a fundamental and necessary component of the civil engineering program. . . . Dr. Issa has 16 refereed publications [10 published and 6 accepted to be published], more than half of them with his graduate students. I have visited his research laboratory several times and was impressed by the modernization which has been achieved in a rather short period of time.

(Ex. 37 to Defendant's Statement.)

On March 15, 1994, the Graduate College Executive Committee met and voted 8-0 with no abstentions in favor of Dr. Issa's promotion with tenure. (Defendant's Statement ¶ 73.) Dean Rocek, in his Justification for Recommendation, wrote: "Dr. Issa's case is summarized beautifully in the letter of endorsement by Dean Paul Chung. I am pleased to add my endorsement of this deserving promotion." On April 18, 1994, Wanat wrote his Justification for Recommendation in support of Dr. Issa's P&T Application. Broski agreed with Wanat's recommendation. On May 17, 1994, Stukel wrote Issa, advising him that: "I am pleased to support the recommendation forwarded to me that you be promoted to the tenured rank of Associate Professor of Civil Engineering, Mechanics and Metallurgy." (Ex. 40 to Defendant's Statement.)

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wade v. Lerner New York*, 243 F.3d 319, 321 (7th

Cir. 2001). The Seventh Circuit has recognized that "[t]his standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues," *Heinemeier v. Chemetco, Inc.*, 246 F.3d 1078, 1082 (7th Cir. 2001) (quoting *Sample v. Aldi Inc.*, 61 F.3d 544, 547 (7th Cir. 1995)); nevertheless, "if the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Baron v. City of Highland Park*, 195 F .3d 333, 338 (7th Cir.1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In this case, Plaintiff submits that there are genuine issues of material fact concerning his national origin claim.

## B.    The Denial of Plaintiff's Application for Promotion and Tenure

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer such as Defendant "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may meet his burden of proof under Title VII by offering either direct proof of discriminatory intent or by proving disparate treatment through the indirect, burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). *See Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001).

Because Plaintiff offers no direct proof of discrimination,[11] the court analyzes his claim under the *McDonnell-Douglas* test. Under this test, Plaintiff must first demonstrate a *prima facie* case of discrimination by showing that he (1) is a member of a protected class; (2) was qualified for tenure; (3) was denied tenure; and (4) an applicant not in the protected class was granted tenure. *Namenwirth v. Board of Regents*, 769 F.2d 1235, 1240 (7th Cir. 1985). If Plaintiff is able to establish a *prima facie* case, the burden of production shifts to Defendant to articulate a nondiscriminatory reason for denying Plaintiff tenure. *See Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). If Defendant produces a nondiscriminatory reason for its decision, Plaintiff must then prove that Defendant's stated reason is merely a pretext for national origin discrimination. *Id.*

Defendant concedes that Plaintiff meets the first, third and fourth elements of his *prima facie* case, but argues that Plaintiff was not qualified for tenure. By making this argument, Defendant also presents its nondiscriminatory reason for the challenged

---

[11]     The court acknowledges Plaintiff's allegation that, on September 26, 1991, Wu made derogatory comments to Plaintiff about his Indian national origin. As the Seventh Circuit recently noted, however, such remarks will only constitute direct evidence of discrimination if "the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)). Wu surely provided input into Defendant's decision to deny Plaintiff tenure, but the evidence demonstrates that Wu's input supported Plaintiff's candidacy. In any event, Wu's alleged 1991 remarks are too remote in time to constitute direct evidence that Plaintiff was unlawfully denied tenure three years later.

action.[12] Because lack of qualification (the second element of the prima facie case) and the issue of pretext essentially focus on the same evidence, the court chooses to proceed directly to the question of whether Plaintiff has presented sufficient evidence to create a genuine issue of material fact on pretext. *See Vanasco*, 137 F.3d at 966 ("Indeed, we have previously noted that 'in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner.'") (quoting *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996)). *See also Oliva v. Pride Container Corp.*, 81 F. Supp. 2d 907, 908 (N.D. Ill. 2000).

In order to carry his burden, Plaintiff must provide evidence that Defendant's

---

[12] Pinpointing Defendant's stated nondiscriminatory reason is somewhat challenging because the Justifications of Rocek and Broski and the affidavit of Stukel provide multiple, and not necessarily overlapping, bases for the denial. Rocek found Plaintiff's publication amount "reasonable," but "not outstanding," his letters of reference "supportive" but not "strong," and his funding record weak because his grants were not from nationally funded agencies. Broski agreed that Plaintiff's funding record was weak, stating that "most of his grants are from Argonne National Laboratory," Plaintiff's former employer. Finally, Chancellor Stukel, in his September 27, 2000 affidavit, testified that he endorsed Dean Broski's recommendation to deny tenure because, among other things, "Dr. Sinha had not demonstrated the ability to obtain large competitive awards from nationally recognized funding agencies[,] . . . Dr. Sinha's area had been discontinued at the undergraduate level[, and] . . . Dr. Sinha's teaching, service, and external reviews were not exceptional enough to overcome these weaknesses." Stukel Aff. ¶ 9. The court concludes that, as is often the case in tenure cases, these reasons can be distilled to one—Defendant did not find Plaintiff to be, on the whole, exceptional enough to warrant the coveted position of Associate Professor with tenure.

explanation for the denial of tenure has no basis in fact, was not the real reason, or was insufficient to motivate the action. *See Hoffman-Dombrowski v. Arlington Intern. Racecourse, Inc.*, 354 F.3d 644, 651 (7th Cir. 2001). Due to the layered and subjective nature of the tenure process, and the courts' recognition that such decisions are based on the fine "distinction between competent and superior achievement," *see Kuhn v. Ball State Univ.*, 78 F.3d 330, 331 (7th Cir. 1996), this is an extremely difficult burden to carry.

Plaintiff here attempts to do so in two ways. First, he argues that the real reason he was denied tenure is that Dean Wu discriminates against those of Indian origin. Wu manifested this prejudice, Plaintiff claims, by withholding information from and providing false information to upper-level decision makers during his promotion and tenure review. Because the upper-level decision makers relied on Wu's Justification, Plaintiff argues, Wu was able to surreptitiously taint the remainder of Plaintiff's P&T consideration. Specifically, Plaintiff claims that Wu provided the College of Engineering Executive Committee and Dean Chung with a Justification that was significantly different from the one Defendant has included at Exhibit 22 to its Statement of Facts. This "original" Justification, Plaintiff asserts, (1) made reference to only 40% of Plaintiff's refereed journal publications and only 40% of Plaintiff's grant money, (2) contained an incorrect quality assessment of the grants Plaintiff received; and (3) failed to mention the excellent ratings by external reviewers.

The court finds this argument, supported only by Plaintiff's self-serving affidavit, wholly unconvincing. The Seventh Circuit has consistently held that

"self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). No other evidence supports Plaintiff's notion that Wu, who hired Plaintiff as an Assistant Professor in 1988, acted with discriminatory animus in the promotion and tenure decision in 1993 and 1994. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999) (applying the "common actor" presumption to affirm summary judgment in an age discrimination case); *E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) (noting that an inference against racial discrimination arose where same director hired and fired African-American employee); *see also Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n. 3 (5th Cir. 1997) (noting that an inference against national origin discrimination arose where same supervisor hired and fired Pakistani employee).

Most importantly, however, the court rejects Plaintiff's allegation of Wu's underhanded behavior because the record offers a highly plausible explanation for what transpired during January 1994. It appears that Wu *did* update his "original" Justification, as well as the P&T Application, as soon as he received Plaintiff's January 17, 1994 memorandum—an act favorable to Plaintiff's case for promotion. Chung testified that he received Wu's "original" Justification at some time before January 10, 1994 and then received Wu's updated Justification at some time before January 21, 1994. Moreover, he noted that the updated Justification did not differ substantially from the "original" Justification (except for the number of publications listed) and is the

same version as that attached as Exhibit 22 to Defendant's Statement. Chung's January 21, 1994 Justification lends credence to this testimony and to Wu's explanation. If Wu, as the court has found, did update his Justification and Plaintiff's P&T Application upon receipt of Plaintiff's January 17, 1994 memorandum, the updated material would have reflected that Plaintiff had seven published articles in refereed journals since joining UIC and three articles accepted to be published. Indeed, Chung's January 21, 1994 Justification refers to Plaintiff's *ten* publications in refereed journals. Chung testified that, in this Justification, he referred only to articles published since Plaintiff began his probationary period (as well as those accepted for publication) because "those are much more significant than those prior to the probationary period." Chung Aff. ¶ 8. Without any evidence that this explanation is untenable, the court finds Plaintiff's allegation of Wu's deceit unconvincing. To the contrary, the credible evidence in this record demonstrates that Wu actively supported Plaintiff's candidacy.

Consequently, the fate of Plaintiff's claim rests on his second attempt to prove pretext—an argument that Defendant's proffered explanation has no basis in fact because he was more qualified than other, non-Indian Assistant Professors at UIC who were granted tenure. In support of this argument, Plaintiff provides the court with comparisons of his qualifications and accomplishments to those of Professors Solworth, Harren, and Issa. Such comparisons are no doubt important, *see, e.g.*, *Vanasco*, 137 F.3d at 967 (granting summary judgment to defendant because, *inter alia*, plaintiff failed to "engag[e] in a detailed comparison of her own qualifications . . . to those of the younger candidates who were granted tenure."), but the court concludes that they do not

support Plaintiff's case here.

First, with respect to Dr. Solworth, who was awarded tenure in 1993, the court notes that he worked in a different department than Plaintiff (Department of Electrical Engineering and Computer Science) and there is no evidence in the record that Solworth's specialty, parallel processing, was discontinued at the undergraduate level. Ignoring these differences, Plaintiff focuses on the fact that Solworth published fewer articles than Plaintiff at the time he was being considered for promotion with tenure. This appears to be true; however, even if Solworth and Plaintiff were otherwise comparable, such a distinction would not warrant a finding in Plaintiff's favor. The number of publications is only one of various factors considered in the decision-making process. *See* Exhibit 1 to Defendant's Statement, Art. IX, § 3e; *cf. Namenwirth v. Board of Regents*, 769 F.2d 1235, 1242 (7th Cir. 1985) ("It is not our role, as federal courts have acknowledged, to consider merely the hard evidence of research output and hours spent on committee work, and reach tenure determinations *de novo*. A crucial part of the evidence we rely on is the esteem in which the candidate is held by the very persons making the tenure decision."). A curriculum vitae consisting of relatively few publications can be salvaged by other positive credentials. For example, the reviews in Solworth's file show that Defendant considered important the fact that Dr. Solworth had been awarded more than $400,000 in research grants from the National Science Foundation and the Office of Naval Research, a "very impressive feat for a young assistant professor." Exhibit 5 to Plaintiff's 56.1 Statement. Moreover, Solworth's reviewers, who included Chung, Broski, and Wanat, noted that Solworth's relative lack

of publications was understandable because "experimental engineering is expensive and time-consuming." *Id.* Plaintiff claims that he too is an experimentalist, and does not see why the same logic would not apply to him. Without evidence demonstrating how and why his field of research is similar to Solworth's, the court cannot assume that the same logic should apply.

Dr. Harren, granted tenure in 1996, had been an Assistant Professor in the CEMM Department, but Harren specialized in crystal plasticity as opposed to superconductors and ceramics. There is no evidence in the record that Harren's speciality was discontinued at the undergraduate level. Moreover, as evidenced by Wu's Justification, Dr. Harren presented a unique situation because of his "uncompromising quality scholarship." Exhibit 6 to Plaintiff's 56.1 Statement. The reputation of his work is echoed in the external reviews which labeled him "a colossus of the future." *Id.*

Dr. Issa provides the closest comparison to Plaintiff because he was considered for tenure at the same time by the same persons. Plaintiff claims that, whereas Wu under represented Plaintiff's publications and grant money, Wu enhanced Issa's records by falsely representing that Issa received $625,000 from three grants. The court has already explained why this argument can be ignored. *See supra* Factual Background. Nor is the court moved by Plaintiff's allegation that Rocek stalled the investigation into Issa's academic misconduct or improperly failed to mention such an allegation in his review. Plaintiff has provided the court with no evidence that Rocek or anyone else intentionally stalled the investigation, and the court does not share Plaintiff's certainty that good practice required Rocek to bring this uninvestigated charge to the attention

of the other decision-makers. As far as the court can tell, Issa, at the time he was considered for tenure, had received more funding than Plaintiff ($303,000 compared to $250,000) and had published more articles in refereed journals since joining UIC (10 articles published and 6 accepted compared to 8 articles published and 4 accepted).

This is not to say that these three Assistant Professors were far and away more qualified than Plaintiff or that Plaintiff was entirely unqualified to be promoted with tenure. Indeed, as Dean Broski noted in his Justification, "Dr. Sinha [wa]s at the margin." According to the Seventh Circuit and its district courts, however, the law demands more than evidence that an individual was a "close call." *See Vanasco*, 137 F.3d at 968; *Kuhn v. Ball State Univ.*, 78 F.3d 330, 333 (7th Cir. 1996); *Namenwirth*, 769 F.2d at 1242 ("[W]inning the esteem of one's colleagues is just an essential part of securing tenure. And that seems to mean that in a case of this sort, where it is a matter of comparing qualification against qualification, the plaintiff is bound to lose."); *Rheams v. Marquette Univ.*, 989 F. Supp. 991, 1008 (E.D. Wis. 1997) ("[T]he Seventh Circuit has noted that employers may act for many reasons, good and bad; they may err in evaluating employee's strengths; unless they act for forbidden reasons, these errors (more properly, differences in assessment) do not matter."). As these decisions demonstrate, this court does not decide whether UIC should have awarded Plaintiff promotion and tenure. Instead, the court determines whether Plaintiff has presented evidence that creates a dispute concerning his claim that University officials were motivated by his national origin. The court concludes on this record that he has not done so.

## **CONCLUSION**

For the foregoing reasons, the court grants Defendant's motion for summary judgment (Doc. 36-1).

ENTER:

Dated: August 15, 2001

REBECCA R. PALLMEYER
United States District Judge